THE NEW YORK FIRE INSURANCE COMPANY

*v.*

WILLIAM A. TOOKER et al.

1. On bill to set aside a sale as fraudulent, it is not enough to show that the vendor intended to defraud his creditors, but the further fact must be shown that the vendee was either an active or passive participant in the fraud of the vendor.

2. To constitute him such participant, it is not necessary to show that he

had direct or positive knowledge of the fraudulent purpose of the vendor, but it will be sufficient to show that he had notice of such facts and circumstances as would naturally lead up to a strong inference of fraud.

3. Where special relief is sought in a bill, and not specifically mentioned in the prayer, and the proofs make a strong case for the granting of such relief, equity will order an amendment of the prayer, and make a decree in accordance with such amendment.

The complainant brought suit in the supreme court against the defendant Tooker, to recover $5,000 and interest, due on a promissory note. On July 30th, 1881, by order of a justice of the supreme court, the complainant entered judgment over the pleas filed by the defendant Tooker, and on the same day the sheriff of Essex county levied upon the goods and chattels of Tooker, in his clothing store. On the 1st day of August following, the defendants Derby, Sprague and Brown filed a claim of property with the sheriff, and on the 15th of August complainant's judgment and levy were set aside by order of the court. On the 12th of September following, a verdict was found in the Essex circuit for the complainant for $6,826.30, and judgment entered thereon, and the *fi. fa.* issued thereon being returned unsatisfied, the complainant filed its bill to set aside an alleged sale made by Tooker to the defendants Derby, Sprague and Brown.

Prior to the alleged sale, set up in the answer, the defendant Tooker had been for some time negotiating for a sale of his goods and chattels to Hall, Bailey and Brown, for the sum of $20,000, $4,000 to be paid in cash by Hall and Bailey, and the balance, $16,000, in the notes of the firm, and Tooker had on the 29th of July, in his possession, notes made in the name of Hall, Bailey & Co., for $16,000. He, in this transaction, claimed to be acting as the agent of Brown, although Brown, in his testimony, denies all knowledge of the transaction. The attorney of Hall having learned of the pendency of complainant's suit against Tooker, the negotiations were broken off and the notes returned about noon of July 29th. Tooker, as he alleges, immediately sold the same property to the defendants Derby, Sprague and Brown, for $17,463, Derby and Sprague being clerks in his employ at that time, Derby putting in $500 capital

by surrendering to Tooker his own note for that amount, Sprague putting in $200 represented by Tooker's note to his wife, and Brown, for whom Tooker again acted as agent, advancing through him, on the 1st of August following, as his share of the capital, Tooker's notes for $4,600, and the balance was secured by notes of the alleged firm signed on the evening of July 30th, but dated July 29th, 1881. Tooker testified that he was insolvent on July 29th, being in debt $30,828, besides the complainant's judgment, which he declined to recognize as a debt, and that he more especially sold out to make good a trust fund, which he regarded as sacred, left by his wife to his children, $5,300 of which he had employed in his business.

At the time of the sale there had been no communication between Derby, Sprague and Brown, with reference to this sale, the price or terms, or about a copartnership. In all these matters Tooker claimed to be acting, and acted, for Brown.

When the deputy sheriff made his levy on the 30th of July, the defendant Derby, who was present in the store, admitted that the goods levied on were the property of Tooker, and that the business was then carried on for him, or as it is stated in the admission of the defendants in their answer, the sheriff having asked the defendant Derby to whom the goods in the store belonged, he was unable to answer whether in point of law the title to the said goods had passed to them or not, but in their ignorance of legal proceedings, or what was requisite to pass the title to said goods or to make a binding bargain, and supposing that because they had not fully paid for said goods and had not received a bill of sale, therefore their own title thereto was not completed, and being very much confused and embarrassed by the demand made by the said deputy sheriff, the defendant Derby did say to the said deputy sheriff, that the goods were the goods of the said Tooker, and the business was carried on for him. The defendants, in their answer, further admit that the agreement to purchase these goods, alleged to have been made on the 29th of July, was completed on the 1st day of August following, by receiving from Tooker the bill of sale for the goods.

*Mr. James W. Vroom,* for complainant.

*Mr. T. N. McCarter,* for defendants Derby, Sprague and Brown.

VAN FLEET, V. C.

The evidence leaves no doubt whatever on my mind that Tooker was controlled by a fraudulent .purpose in making the sale in question. It was made the day before the complainant was entitled to a judgment for a debt that Tooker says he did not recognize. It was made for nearly $3,000 less than he could have realized for the same goods from other parties, but who would not purchase unless the debt due to the complainant was paid, or some arrangement was made respecting it, which would relieve its purchase from the danger of its being challenged. It was made, as Tooker says, to raise money to make good a trust fund, which his deceased wife had left to her children, and which he had imperiled by embarking it in his business. How this trust was created, whether it was a mere invention of Tooker's, devised when he was confronted by insolvency, to enable him to rescue something from his creditors for his family, the court has no information. That a trust existed, or that he was a trustee, has no other support in the evidence than the following statement by Tooker :

" I sold out especially to make good a trust fund ; * * * it was money that my wife had left her children, and such things that had come into my possession, that I had used in the business, and I looked upon it as a sacred trust."·

The amount of this fund is stated to have been $5,000. With regard to this claim, I am required to say that there is not a particle of evidence tending to show that it had the slightest existence either in law or morals.

Tooker's insistment that the sale should be carried through, after he found the goods had been levied on, notwithstanding the admission of one of the purchasers that Tooker was still the owner of the goods, renders his object in making the sale con-

spicuously clear.   He, undoubtedly, intended to place the goods beyond the reach of the complainant.

I consider the proof in demonstration of the fact that Tooker . wanted to sell for the purpose of defrauding the complainants, as conclusive.

The evidence upon the other question of the case, namely, did the vendees knowingly help Tooker to carry out his purpose to defeat the complainant in the collection of its debt?   I regard as almost equally clear.

Now, in a case of this kind, it is not enough to show that the vendor made the sale with intent to defraud his creditors, but the party seeking to set the sale aside must show, in addition, that the vendee was either an active or passive participant in the vendor's fraud.   He must show, either that the vendee had direct information that the vendor desired to make the sale to defraud his creditors, or that the vendee purchased with notice of facts and circumstances from which the fraudulent purpose of the vendor was a natural and legal inference.   *Atwood* v. *Impson, 5 C. E. Gr. 150; Tantum* v. *Green, 6 C. E. Gr. 364; Merchants Bank of Newton* v. *Northrup, 7 C. E. Gr. 58.*

I shall assume that the vendees, in this case, did not know that Tooker was insolvent up to the 29th of July, 1881, at noon, and that they did not hear of the complainant's debt until July 30th, 1881.   At noon, on July 29th, 1881, is the time fixed by both vendor and vendees, when the sale under which the defendants claim was made.   Was a sale, full and complete, made at that time?   That I regard as the decisive question of the case.

The alleged purchasers were Nicholas Derby, William H. Sprague and Ezra Brown.   The notes given on the evening of July 30th, though dated on the 29th, in execution of the purchase, were made by the firm name of Derby, Sprague & Co. At that time no copartnership had been formed by these three persons, nor did any other business relation exist among them. Prior to the purchase, no agreement of copartnership had been made, nor, as far as appears, had any negotiation ever taken place among them upon that subject.   All that had ever passed

between them, so far as the evidence shows, was, that they had expressed to each other, or at least Derby and Brown had expressed to each other, a mutual desire to buy Tooker's stock of goods. Brown was not present at the sale, nor did he know that a purchase by himself, in connection with Derby and Sprague, was contemplated until after the alleged sale was actually concluded. And what is still more remarkable, in my estimation, is the fact that this same Brown, only the day before figured as a member of another firm, which had been formed, without his knowledge, for the purpose of purchasing the same stock of goods. At the time it is claimed that the sale in question was effected, it is clear that no such relation or association existed between Brown on the one side, and Derby and Sprague on the other, as gave Derby and Sprague any right or authority to bind Brown, or to act or speak for him.

But this difficulty is attempted to be overcome by showing that Brown, some time before, notwithstanding the fact that if a sale was made Tooker must be the vendor, had given Tooker authority to act for him, as his agent, in the purchase. I find it impossible to believe that any man in the full possession of his senses would enter into an arrangement whereby he appointed the person of whom he expected, in conjunction with others, to make a purchase, as his agent. I regard it as a thing incredible that any rational man, in an enterprise of this kind, would, in the selection of an agent, take a person as his agent whose interests were strongly antagonistic to his, in preference to another whose interests were identical with his. It is barely possible that the statement is true, but if it is, I venture to say it is the first instance of the kind that has ever occurred.

I think the fact that no copartnership or other union or association existed among the vendees on the day it is alleged the sale was made, must be regarded as furnishing very cogent evidence that no sale, in fact, was made. But evidence of even a more convincing character is furnished on this point. The defendants, by their answer, admit that Derby stated to the sheriff on the 30th of July, when he came to levy upon the goods under the complainant's execution, that the goods were the prop-

erty of Tooker, and that the business was Tooker's. Such an admission, except it was made under very extraordinary circumstances, should be regarded as conclusive.

But it is now attempted to be shown that this admission was false, and it is insisted that the defendants should not be bound by it, because Derby made it while in a state of fright and confusion, and under a belief that it was necessary for him to do so in order to escape litigation. With my views of human nature, the interpretation sought to be put upon Derby's conduct cannot be accepted as either natural or reasonable. Ordinarily, men under the influence of surprise or fright do not tell falsehoods rather than the truth, especially in cases where it is apparent to the meanest comprehension that the truth will serve them better than falsehood. Falsehood, as a general rule, requires study—there must be time for invention—an imaginary state of facts, either in whole or in part, must be substituted in the place of the actual facts of the case, and, with the ordinary mind, this requires time and effort, but not so with the truth—that may be told by simply giving oral expression to what the mind already knows and clearly comprehends.

I confess I find it impossible to believe that Derby's admission did not express what he believed to be the truth respecting the ownership of the goods in question. I think if he had understood that a definite and binding contract of purchase had been made, such as gave him a title to the goods and rendered him liable for their price, that the moment an attempt was made to seize them for the debt of another, his natural opposition to injustice and love of his own would have constrained him to have asserted his rights, no matter how great his fear of litigation or bewildering his confusion. I am bound to deal with this matter in the light of ordinary experience, and to reject any theory which presents a phase of human conduct contrary to common experience. I do not believe that the average man will tell a lie when he can plainly see that the truth will much better serve his purposes.

The transaction which the defendants insist should be upheld as a valid sale is marked by a great many other circumstances

which naturally tend to excite strong suspicion, but which it does not seem to me to be necessary to point out or decide. The decisive fact against the claim made by the defendants is, in my judgment, the total absence of anything like a prearrangement among the purchasers for association or joint action prior to the alleged sale. Without such prearrangement, it is obvious, a purchase by the three was a legal impossibility. If it were possible to believe that Brown appointed Tooker his agent to represent him in a sale to be made by Tooker to Brown and others, such agency certainly would confer no authority upon Tooker to enter into an agreement of copartnership with Derby and Sprague, or any other contract for joint action. He does not pretend that he made a contract of that kind for Brown.

My conclusion is, that no sale was made on July 29th, and that if any was made at all, it was not made until after Tooker's return from Nyack, on the evening of July 30th. The purchasers at that time had full notice of the complainant's debt, and of Tooker's determination to escape its payment. They knew that he falsely insisted that a sale had been made on July 29th for the purpose of placing the goods, if possible, beyond the reach of the complainant's execution. On the 30th of July they made no claim that they were the owners of the goods until after Tooker told them they had purchased them and were in possession of them. So eager were they to assist Tooker in rescuing the goods from the complainant, that it does not seem to have occurred to them that they might fortify their title against the complainant's claim by requiring Tooker to pay it, as a condition on which the sale should be completed. Perhaps they knew that the sale made on the day previous had been abandoned because Tooker refused to pay complainant's debt out of its proceeds. Plainly stated, the case of the defendants is this: they carried through a sale which had been initiated but not completed, after they had full notice of the complainant's claim, and after they were informed in the most unmistakable manner, that the vendor's object in making the sale was to defeat the collection of the complainant's claim. It is hardly necessary to say that vendees occupying this position have no

right to lay claim to the character of innocent purchasers. A purchaser, to be able to maintain his title against the creditors of his vendor, must not only be a purchaser for value, but a *bona fide* purchaser.

In my opinion, the complainant is entitled to a decree nullifying this sale. In order to make such a decree conform to the special relief sought by the bill, the prayer of the bill must be amended by the insertion of a prayer that the sale be set aside. Leave to amend in this respect will be granted. I think the complainant is also entitled to the appointment of a receiver. Since the defendants have been in possession of the goods they have sold part of them, probably the most of them. The complainant is entitled to the proceeds of these sales, or at least to so much of them as may be necessary to pay its judgment. A receiver will be appointed to take possession of the goods undisposed of, and also to collect of the defendants as much of the proceeds of the sales made by them as may be required to pay the complainant's judgment.

The complainant is entitled to costs.